WILLETT and wife, Respondents, vs. STEWART and wife, imp., Appellants.

*January 13—April 12, 1938.*

306

*Geo. W. Taylor* of Kenosha, for the appellants.

For the respondents there were briefs by *Hammond & Jones* of Kenosha, and oral argument by *Walter W. Hammond.*

The following opinion was filed February 15, 1938:

MARTIN, J. There are some undisputed facts in this case which we regard very important. There was a positive representation made to Mr. Stewart that his $5,000 loan to the Runges was to be secured by a mortgage on about eleven and one-half acres of land and a tile factory. It is so stated upon the face of the note secured by the mortgage. It further appears from the findings that the descriptions in both the deed and the mortgage, deducting the areas included in the parts excepted and including the one and four-tenths acres referred to as the Willett homestead, leave a total area covered by the Stewart mortgage of less than eleven acres. It further appears from an examination of the blueprint offered in evidence that the total area, including what was referred to on the trial as the Bristol Tile Works property and including the property referred to as the Willett homestead and the Runge home, also including the area in the road located along the east side of the Bristol Tile Works property and the area within the right of way of the Chicago & North Western Railway Company on the south and excluding the Brown property located in the southeast corner of the plat, amounts to only twelve and one-tenth acres. The Stewarts had no transactions with the Willetts. There is no

contractual relationship between the Willetts and the Stewarts. From the findings it appears that Mr. Stewart had not seen the property at all before making the loan to the Runges; that the exact boundaries of the property to be included in his mortgage had never been pointed out to him, but he was told and did expect that his mortgage was to cover about eleven and one-half acres of land and a tile factory situated upon the land. Mr. Stewart knew that the Runges were to get their title from the Willetts. The court has found:

"That the defendants Calvin Stewart and Emma W. Stewart did not rely upon having both the Tile Works and the plaintiffs' homestead premises . . . as their mortgage security. . . ."

It appears without dispute that Mr. Stewart had no information concerning the location of the Willett homestead or anything about it. So far as Mr. Stewart is concerned, it is clear that he did expect security upon the property referred to in the note to which reference is made above. It appears that prior to 1924, Mr. Willett and Gordon W. Brown operated the Tile Works as a partnership. During the year 1924, Mr. Brown sold his interest in the partnership business to the defendant, John Runge. At this time, Mr. Willett borrowed $4,000 from Thomas Garland and gave Mr. Garland a mortgage upon the so-called Tile Works property, including the property now referred to as his homestead. This $4,000 was used to pay Mr. Brown for his one-half interest in the Bristol Tile Works. In June, 1929, when plaintiffs deeded the property in question to the Runges, and when Mr. Stewart made his $5,000 loan to the Runges, $4,000 of the proceeds of the loan were used to pay and discharge the Garland mortgage. Mr. Willett never had a separate deed of his homestead property. It was included in the same deed under which he acquired title to all the property many years before. It appears that Mr. William Runge, a brother of

the defendant John Runge, negotiated with Mr. Stewart for the loan. In that connection, Mr. Stewart testified:

"I was told by Mr. Runge that they needed the money to pay off a mortgage on the premises. I said, 'The mortgage has got to be paid off before I would loan any money. I don't want any second mortgage.' He told me a man by the name of Garland held the mortgage and I think it was for $4,000. I never went out to look at the property before I loaned the money. I do not remember ever seeing it before, except I think I drove by it three or four years before but I had no thought of loaning money on it at that time. I do not recall seeing Mr. and Mrs. Runge about the time of these negotiations. I think I wrote a check and handed it to William Runge."

From this undisputed testimony, the only logical inference to be drawn is that Mr. Stewart understood and expected that he would have a first-mortgage loan on the property covered by the Garland mortgage which was to be paid out of the proceeds of his loan. Mr. Stewart testified:

"I had nothing whatever to do with the drawing of the deed from Willett to Runge and I wasn't present. . . . The description for the mortgage was obtained from the deed. I never read the description. The mechanical work was done by a young man by the name of Robert Lotz. I don't know who wrote the deed. I know this because I told Robert Lotz in Mr. Runge's presence to compare the description on the mortgage with the description in the deed. I assume they did."

Mr. William Runge testified that Mr. Stewart assisted him in preparing both the deed and mortgage. He further testified that in connection with preparing the deed from Willetts to Runges, they had before them a plat book with certain pencil drawings on the plat indicating the dimensions of the Willett homestead which was to be excepted from the conveyance. This plat with alleged pencil drawings was not offered in evidence. The defendants, John and Zelba Runge,

made no defense; in fact, they consented to the deed and mortgage being reformed. No doubt, there was a mutual mistake as between the Willetts and the Runges. However, a careful study and consideration of all the evidence convinces us that there was no mutual mistake such as is necessary for reformation on the part of the Stewarts. In *Jentzsch v. Roenfanz,* 185 Wis. 189, 193, 201 N. W. 504, being an action for the reformation of a deed, the court said:

"The determination of this case must rest upon the question of whether or not there was a mutual mistake. A mistake, in order to be mutual, means one reciprocal and common to both parties, where each alike labors under the misconception in respect to the terms of the written instrument. *Botsford v. McLean,* 45 Barb. 478, 481.

"If the mistake has not been mutual but has been made inadvertently on one side and yet in good faith by the other, if any amendment or reformation of the contract can, under any circumstances, be made, it cannot be made so as to make the agreement conform merely to the views of the party seeking reformation, but only to the original views of both parties. See 5 L. R. A. p. 157, note: 'Mutuality of mistake necessary to reformation of contract,' and cases cited. See also 23 Ruling Case Law., p. 327, § 20, and cases cited." *Miller v. Stanich,* 202 Wis. 539, 548, 230 N. W. 47, 233 N. W. 753.

In Restatement, Contracts, on reformation for mutual mistake, p. 968, § 504, it is said:

". . . Where both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby."

The burden of proof was upon the plaintiffs to show by clear and satisfactory evidence that they were entitled to

reformation as against the Stewarts. *Hoeft v. Kennedy,* 214 Wis. 187, 190, 252 N. W. 589, and cases cited.

We must hold that the findings as to any mutuality of mistake between the plaintiffs and the Stewarts, or between the Runges and the Stewarts, are against the great weight and clear preponderance of the evidence. The judgment as to appellants must be reversed.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the action as against the defendants Calvin Stewart and Emma W. Stewart.

A motion for a rehearing was denied, with $25 costs, on April 12, 1938.